[Cite as *State v. Edmond*, 2016-Ohio-1034.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 15AP-574 |
| | | (C.P.C. No. 12CR-3577) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Raynell D. Edmond, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 15, 2016

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellant. **Argued:** *Barbara A. Farnbacher*.

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, P.J.

{¶ 1} Defendant-appellant, Raynell D. Edmond, appeals the May 11, 2015 judgment of the Franklin County Court of Common Pleas convicting him and imposing sentence following a jury trial. For the reasons that follow, we affirm the judgment of the trial court.

I. Facts and Procedural History

{¶ 2} In November 2009, Charles Stringer, a resident of Columbus, Ohio, traveled to Indiana and convinced his half-brother, Quentin Stringer, to commit a robbery in Columbus. Quentin enlisted his friend, Victor Harris, to assist the robbery. Harris and Quentin also enlisted someone they knew as "Big Cheddar," who was ultimately identified as appellant, to assist the robbery. (Tr. Vol. III, 217.) In November 2009, Quentin,

Harris, and appellant traveled to Columbus and met with Charles. Quentin gave appellant a silver revolver, and he loaded it with ammunition.

{¶ 3} On November 24, 2009, Charles decided to rob Tony Fleming, an acquaintance who grew and sold marijuana from his home. Charles called Fleming under the guise of seeking to purchase marijuana. Fleming stated that he was not home and he told Charles to go to his house and buy from his girlfriend, Meghan Deckard.

{¶ 4} Charles drove to Fleming's residence, where he dropped off Quentin, Harris, and appellant. Quentin, dressed in a cable company hooded sweatshirt, went to the front door of Fleming's house. Bradley Greiner, a friend of Fleming's who was spending the night at the house, informed Deckard that there was a man from the cable company outside and Deckard answered the door. Quentin immediately assaulted Deckard as he rushed into the residence. Greiner attempted to assist Deckard in her struggle against Quentin. He pulled Quentin off of her and she ran to the kitchen to retrieve a gun. Appellant entered the residence and began firing a pistol, shooting and killing Greiner. Deckard saw Greiner run to the kitchen and fall to the floor. Following the burst of gunfire, Quentin and appellant fled the residence, allowing Deckard to call police. Harris never entered the residence. Charles picked up the three men, and they left the area.

{¶ 5} A detective with the Columbus Police Crime Scene Search Unit recovered a cigarette butt from the front yard. DNA recovered from the cigarette butt was found to match appellant's DNA. Ultimately, Charles and Quentin admitted their involvement in the incident and agreed to testify against appellant pursuant to plea agreements. Charles testified that he saw Quentin give appellant a gun, which appellant loaded with ammunition. Quentin identified appellant as the person who shot and killed Greiner. Harris was not charged with a crime, but did testify at trial that appellant possessed a revolver at the time of the incident.

{¶ 6} Columbus police detectives traveled to Indiana to interview appellant, who was in prison on an unrelated matter, regarding his involvement in the November 24, 2009 incident. Appellant denied any involvement and stated that he had never been to Columbus, Ohio.

{¶ 7} On July 17, 2012, a Franklin County Grand Jury filed an indictment charging appellant with four criminal counts: aggravated murder, in violation of R.C. 2903.01; murder, in violation of R.C. 2903.02; aggravated burglary, in violation of R.C.

2911.11; and aggravated robbery, in violation of R.C. 2911.01. All four counts contained an attached firearm specification and repeat violent offender specifications.

{¶ 8}  Beginning March 16, 2015, the case was tried before a jury. On March 20, 2015, the jury returned a verdict of guilty as to the counts of murder, aggravated burglary, and aggravated robbery, all with attached firearm specifications. A nolle prosequi was entered as to the count of aggravated murder. On May 7, 2015, the trial court found appellant guilty on the repeat violent offender specifications. The trial court merged the aggravated burglary and aggravated robbery convictions and imposed an aggregate sentence of 31 years to life. On May 11, 2015, the trial court filed a judgment entry reflecting appellant's conviction and sentence.

## II. Assignments of Error

{¶ 9}  Appellant appeals assigning the following two errors for our review:

> I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF MURDER; AGGRAVATED ROBBERY; AND AGGRAVATED BURGLARY AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> II. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY OVERRULING HIS MOTION TO SUPPRESS.

For ease of discussion, we address the assignments of error out of order.

### A. Second Assignment of Error—Motion to Suppress

In his second assignment of error, appellant asserts that the trial court erred by overruling his motion to suppress out of court statements because he was not provided *Miranda* warnings prior to questioning by detectives.[1]

{¶ 10}  "Appellate review of a trial court's decision regarding a motion to suppress evidence involves mixed questions of law and fact." *State v. Holland*, 10th Dist. No. 13AP-790, 2014-Ohio-1964, ¶ 8. "When considering a motion to suppress, the trial court, as trier of fact, is in the best position to resolve factual questions and evaluate the

---

[1] *Miranda v. Airzona*, 384 U.S. 436 (1966).

credibility of witnesses." *State v. Harrington*, 10th Dist. No. 14AP-571, 2015-Ohio-2492, ¶ 6, citing *State v. Gravely*, 188 Ohio App.3d 825, 2010-Ohio-3379, ¶ 23 (10th Dist.). Accordingly, an appellate court engages in a two-part analysis: (1) whether competent, credible evidence supports the trial court's findings, and (2) whether the facts satisfy the applicable legal standard, without giving any deference to the conclusion of the trial court. *Holland* at ¶ 8, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. Here, because the relevant facts are not disputed, we apply a de novo standard in determining whether the trial court properly denied appellant's motion to suppress. *In re D.F.*, 10th Dist. No. 14AP-683, 2015-Ohio-2922, ¶ 13; *State v. Johnson*, 10th Dist. No. 13AP-637, 2014-Ohio-671, ¶ 6, citing *Burnside* at ¶ 8.

{¶ 11} The Fifth Amendment to the U.S. Constitution provides a privilege against self-incrimination. *See State v. Hall*, 179 Ohio App.3d 727, 2008-Ohio-6228, ¶ 12 (10th Dist.), citing *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984). To protect this right, the United States Supreme Court has held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Thus, *Miranda* warnings are required when a suspect is subjected to custodial interrogation. *State v. Garnett*, 10th Dist. No. 09AP-1149, 2010-Ohio-5865, ¶ 30. Custodial interrogation is defined in *Miranda* as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* at 444.

{¶ 12} Recently, the United States Supreme Court has provided further guidance on the meaning of custody for purposes of *Miranda*. " '[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, ___ U.S. ___, 132 S.Ct. 1181, 1189 (2012). "In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." (Internal quotations and citation omitted.) *Id.* In considering a suspect's freedom of movement, a court must consider the totality of the circumstances, including the following relevant factors: (1) the location of the questioning, (2) its duration, (3) statements made during

the interview, (4) the presence or absence of physical restraints during the questioning, and (5) the release of the interviewee at the end of the questioning.  *Id.*  However, freedom of movement is not a solely determinative factor, and courts must consider "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Id.* at 1189-90.

{¶ 13} Considering the above analysis, the United States Supreme Court, in *Fields*, found that "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*."  *Id.* at 1190.  This conclusion is supported by the following three reasons: (1) "questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest," (2) "a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release," and (3) "a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence."  *Id.* at 1190-91.

{¶ 14} Further, neither taking a prisoner aside for questioning, nor questioning a prisoner about criminal activity outside the prison walls necessarily converts a non-custodial situation into one in which *Miranda* applies.  *Id.* at 1191-92.  Instead, "[w]hen a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation * * * includ[ing] the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted."  *Id.* at 1192.

{¶ 15} " 'Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated.' "  *Id.* at 1192, quoting *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984).  Thus, voluntary confessions made by prisoners in circumstances not implicated by *Miranda* should not be suppressed because such confessions " 'are not merely a proper element in law enforcement, they are an unmitigated good, essential to society's compelling interest in finding, convicting, and punishing those who violate the law.' " *Fields* at 1192, quoting *Maryland v. Shatzer*, 559 U.S. 98, 108 (2010).

{¶ 16} In *Fields*, the defendant was escorted from his prison cell by a corrections officer to a conference room where he was questioned by two sheriff's deputies about criminal activity that he had allegedly engaged in before he entered prison.  At no time during the questioning was the defendant given *Miranda* warnings or advised that he did

not have to speak with the deputies. The court found the following facts relevant in its analysis: the questioning lasted between five and seven hours; the defendant was told more than once that he was free to leave the interview and return to his cell; the deputies were armed; the defendant was free of restraints during the questioning; the door to the conference room was sometimes open and sometimes shut; several times during the interview, the defendant stated that he no longer wished to speak to the deputies, but he never stated that he wished to return to his cell; according to the defendant, one of the deputies used a "very sharp tone"; after the defendant confessed and the interview concluded, he had to wait an additional 20 minutes for an escort back to his cell; the defendant was returned to his cell after the time he normally went to sleep. *Id.* at 1192-93. Considering all of the circumstances of the questioning and noting especially that it was undisputed that the defendant was told he was free to end the questioning and return to his cell, the court found that the defendant was not in custody within the meaning of *Miranda*.

{¶ 17} Here, we find that, considering the totality of the circumstances, appellant was not in custody for purposes of *Miranda*. Appellant's questioning, like that of the defendant in *Fields*, took place in a conference room at the jail where appellant was being held. Appellant was questioned by two Columbus police detectives. When detectives entered the room, they explained to appellant that they were investigating an incident that occurred in Columbus, Ohio on November 24, 2009. Appellant immediately replied that he was in jail in Indiana when the event in question occurred. One of the detectives exited the interview room and conferred with the jail authorities, who stated that appellant was not in jail when the events in Columbus occurred, but was released on November 22, 2009.

{¶ 18} Upon returning to the interview room, the detective informed appellant that he was not in jail on the dates in question. At that point, detectives began to take an audio recording of appellant's statements. The audio tape reflected that the discussion between appellant and detectives following return to the interview room lasted slightly more than two minutes in total. Detectives challenged appellant on his assertion that he was in jail on the day in question. About one minute after the detective returned to the room, appellant responded that the detectives and jail records were wrong and then told them, "That's it."

{¶ 19} Thereafter, detectives continued to speak to appellant for approximately one minute, asking no questions aside from whether appellant was represented by counsel. Appellant responded, stating that he had never been to Columbus, Ohio, and then again stated he was finished speaking with them. Appellant never stated that he wished to return to his cell. At no point during their conversation with appellant did detectives provide appellant with his *Miranda* rights.

{¶ 20} Here, as in *Fields*, several circumstances weigh in favor of appellant's assertion that he was in custody within the meaning of *Miranda*. Appellant did not invite the interview or consent to it in advance. Appellant was not explicitly advised that he was free to decline to speak to detectives or to terminate the questioning and return to his cell. The door to the interview room remained closed during his questioning except for when one detective left to obtain appellant's jail records.

{¶ 21} However, the above circumstances were offset by others. Appellant was not restrained in either handcuffs or shackles. Neither detective was armed at the time of the interview, and there were no armed guards present in the room. Appellant was questioned during the day, and the questioning lasted for a very brief time, with the relevant portions of the questioning taking around two minutes. The audio recording reflects, and it is uncontested, that detectives maintained a conversational tone with appellant.

{¶ 22} Importantly, although detectives briefly continued to speak to appellant after he stated he was finished speaking to them, appellant, like the defendant in *Fields*, never stated that he wished to return to his cell. Appellant's comment informing detectives that he was finished speaking with them demonstrates that appellant felt free to terminate the interview and return to his cell at a point of his choosing. Furthermore, appellant's termination of the interview demonstrates that he was not subject to coercive pressures resulting from a custodial interrogation, and, therefore, this situation does not implicate the concerns that motivate the protections of *Miranda*. *Fields* at 1189-90. Instead, " '[a]ll of these objective facts are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave.' " *Id.* at 1193, quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664-65 (2004). *See Holland v. Rivard*, 800 F.3d 224, 239-40 (6th Cir.2015). Finally, regarding whether appellant would have felt free to leave, although appellant was not free to leave the conference room by

himself, such circumstances were consistent with his ordinary conditions in prison, as he could not have reasonably expected to roam freely. *See Fields* at 1193-94.

{¶ 23} Based on an examination of the totality of the facts and circumstances and considering the circumstances and standard articulated in *Fields*, we find that appellant was not in custody for purposes of *Miranda*. Therefore, the trial court did not err by denying the motion to suppress appellant's testimony. Accordingly, we overrule appellant's second assignment of error.

### B. First Assignments of Error—Manifest Weight and Sufficiency

{¶ 24} In his first assignment of error, appellant asserts that the trial court erred by entering a judgment of conviction that was not supported by the sufficiency of the evidence and was against the manifest weight of the evidence.

{¶ 25} We first review appellant's claim that his convictions were insufficiently supported by the evidence. Sufficiency of evidence is a "legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When judging the sufficiency of the evidence to support a criminal conviction, an appellate court must decide if, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Where the evidence, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt," it is sufficient to sustain a conviction. *Id.*

{¶ 26} "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25. *See also Thompkins* at 387 ("Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence."). An appellate court must review the entire record, weighing the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the

conviction must be reversed and a new trial ordered. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). This authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.,* quoting *Martin* at 175.

{¶ 27} "[A] defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial." *State v. Spires,* 10th Dist. No. 10AP-861, 2011-Ohio-3312, ¶ 18, citing *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21. The trier of fact is free to believe or disbelieve any or all of the testimony. *Id.* at ¶ 18, citing *State v. Jackson*, 10th Dist. No. 01AP-973, 2002-Ohio-1257. Thus, although an appellate court acts as a "thirteenth juror" in considering the weight of the evidence, it must give great deference to the fact finder's determination of witness credibility. *Spires* at ¶ 18, citing *State v. Covington*, 10th Dist. No. 02AP-245, 2002-Ohio-7037, ¶ 22.

{¶ 28} Although appellant's assignment of error attacks both the sufficiency of evidence and the manifest weight of the evidence, appellant's only argument contends that the witnesses who testified against him were not credible. However, when examining the sufficiency of the evidence, appellate courts "do not assess whether the prosecution's evidence is to be believed, but whether, if believed, the evidence supports the conviction." *State v. Williams*, 10th Dist. No. 14AP-546, 2015-Ohio-1136, ¶ 27, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80. Thus, viewing the evidence in a light most favorable to the prosecution, we consider whether any rational trier of fact could have found the essential elements of appellant's crimes proven beyond a reasonable doubt.

{¶ 29} Appellant was convicted of one count each of murder, aggravated burglary, and aggravated robbery, all with firearm specifications. The state argues that there was sufficient evidence establishing that appellant entered Fleming's house with the intent to rob it and that appellant shot and killed Greiner in the course of the attempted robbery.

{¶ 30} Quentin testified that he, Harris, and appellant traveled together to Columbus, Ohio and met with Charles. Once there, the group decided to rob Fleming's house. Quentin, who was wearing a hooded sweatshirt with the logo of a cable company, approached the door of the residence carrying a clipboard. After Quentin entered the residence and began struggling with Greiner, he saw appellant enter the residence, pull

out a gun, and then fire at Greiner, hitting him more than once. After appellant fired his weapon, Quentin ran from the house, followed by appellant. Additionally, Brian Johnson, a forensic scientist with the Columbus Police Department, testified that he examined the cigarette butt that was found at the house by detectives and determined that DNA on the cigarette butt matched that of appellant.

{¶ 31} This evidence, if believed, was sufficient to convict appellant of the offenses of murder, aggravated burglary, and aggravated robbery. As a result, we find that appellant's convictions were supported by sufficient evidence because, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. *Jenks* at paragraph two of the syllabus.

{¶ 32} Next, we consider whether appellant's convictions were against the manifest weight of the evidence. Appellant contends that Charles and Harris were not credible because Charles changed his account of the incident, and Harris admitted to lying repeatedly to appellant's private investigator about his involvement in the case.

{¶ 33} Although appellant attacks the credibility of Charles and Harris because their accounts differed, it does not render their testimony inherently unreliable and unworthy of belief. Charles admitted that he initially denied all involvement in the incident and that he altered his story after his initial proffer, only later confessing to his role in the crimes. Harris admitted to lying to appellant's investigator about his involvement in the crime. Thus, the jury was aware of the discrepancies in the accounts provided by Charles and Harris and was in the best position to weigh the credibility of the witnesses in light of their earlier fabrications. *State v. J.E.C.*, 10th Dist. No. 12AP-584, 2013-Ohio-1909, ¶ 43; *State v. Zonars*, 10th Dist. No. 13AP-735, 2014-Ohio-2023, ¶ 22; *State v. Callender*, 10th Dist. No. 15AP-15, 2015-Ohio-4255, ¶ 27 (finding that jury was in best position to judge credibility of witness who lied at a prior hearing where the "issue was fully discussed in court, both the instance of the lie, the reasons for it, and then the admitting to it").

{¶ 34} Further, appellant's attacks on the credibility of Charles and Harris fail because appellant's convictions were supported by additional evidence, including appellant's DNA recovered at the crime scene and the testimony of Quentin. Thus, " 'the

testimony of one witness, if believed by the jury, is enough to support a conviction.' " *Williams* at ¶ 27, quoting *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42.

{¶ 35} Appellant also challenges the credibility of Charles and Quentin because they entered into plea agreements, and Harris because he was never charged with a crime related to this incident. However, the jury was aware of the plea agreements and Harris' stated reasons for his testimony and was, therefore, in the best position to weigh those facts in determining the credibility of the witnesses. *State v. Jackson*, 10th Dist. No. 14AP-748, 2015-Ohio-5114, ¶ 24, citing *State v. Barber*, 10th Dist. No. 14AP-557, 2015-Ohio-2653, ¶ 21, citing *State v. Hudson*, 10th Dist. No. 06AP-335, 2007-Ohio-3227, ¶ 17.

{¶ 36} Considering the foregoing, we find it was reasonable for the jury to credit the testimony of the state's witnesses. Therefore, in considering the credibility of the witnesses and the evidence presented at trial, we cannot find that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *See State v. Hillman*, 10th Dist. No. 14AP-252, 2014-Ohio-5760, ¶ 50, citing *State v. Vencill*, 10th Dist. No. 11AP-1050, 2012-Ohio-4419, ¶ 13-14. Accordingly, we overrule appellant's first assignment of error.

## III. Conclusion

{¶ 37} Having overruled appellant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER, J., concurs.
HORTON, J., concurs in judgment only.

———————————